SLIP OPINION

Cite as 2016 Ark. App. 569

# ARKANSAS COURT OF APPEALS

DIVISION II

**No.** CV-16-496

| | |
|---|---|
| DARLENE RODGERS<br><br>                              APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES AND MINOR<br>CHILD<br><br>                              APPELLEES | Opinion Delivered November 30, 2016<br><br>APPEAL FROM THE MISSISSIPPI<br>COUNTY CIRCUIT COURT,<br>OSCEOLA DISTRICT<br>[NO. JV-2014-45]<br><br>HONORABLE RALPH WILSON, JR.,<br>JUDGE<br><br><br>AFFIRMED |

**BRANDON J. HARRISON, Judge**

Darlene Rodgers appeals the order of the Mississippi County Circuit Court that terminated her parental rights to her adopted child, C.R. Rodgers challenges the statutory grounds for termination. We affirm.

On 30 October 2014, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect of nine-year-old C.R. The accompanying affidavit explained that on October 28, a call to the child-abuse hotline reported that C.R. refused to get on the school bus to go home because he was scared. The caller said that C.R. had been whipped at the bus stop and had approximately twenty

bruises on his arms, legs, and back that were in the process of healing. The police investigated, and Rodgers was arrested for second-degree domestic battery.

The circuit court granted the petition for emergency custody and on November 5 found probable cause to continue DHS's custody of C.R. Rodgers was ordered to complete parenting classes, watch "The Clock is Ticking" video, maintain stable housing, obtain and maintain stable employment and/or income, and attend anger-management classes. On November 20, C.R. was adjudicated dependent-neglected due to cuts/welts and bruises on his arms, legs, and back. In addition to the above requirements, Rodgers was ordered to comply with a no-contact order issued in her criminal case and to submit a 2011 psychological evaluation to her attorney or her DHS caseworker.

The circuit court reviewed the case in February 2015 and found that Rodgers had stable income and housing but still needed to complete parenting classes and watch "The Clock is Ticking" video. Another review order in August 2015 noted that Rodgers had completed parenting and anger-management classes and had watched the required video. That order found that the case plan was moving toward an appropriate permanency plan and that the goal of the case would continue to be reunification with Rodgers.

In October 2015, however, the circuit court held a permanency-planning hearing and changed the goal of the case to termination of parental rights and adoption. In its order, the court found that C.R. had been out of his mother's home for twelve months, had been diagnosed with posttraumatic stress disorder, and "continue[d] to have panic attacks and recurrent nightmares in regards to being placed back with his mother." On October 29, DHS and C.R.'s attorney ad litem filed a joint petition for termination of

SLIP OPINION

parental rights alleging that (1) C.R. had been "chronically abused" and "subjected to extreme and repeated cruelty in the form of both mental and physical abuse," and (2) the conditions that resulted in C.R.'s being removed had not been remedied by Rodgers despite a meaningful effort by DHS to remedy those conditions.

The court held a termination hearing on 26 February 2016. Chelsea Fife, a therapist with Families, Inc., testified that C.R. had been her client since June 2015. Fife explained that C.R. had been diagnosed with posttraumatic stress disorder, that she helped him with coping skills and identifying his feelings, and that his therapy was going well. Fife said that when C.R. is asked about Rodgers, he shakes and cries and "will go from smiling and being a happy child to being completely fearful." C.R. told Fife that he did not wish to return to Rodgers's home and that he was "scared to go back." Fife recommended that C.R. not be returned to Rodgers's custody. She also noted that C.R. was "very comfortable" with his foster parents.

Greg Watson, the DHS caseworker assigned to the case, testified that he had regular contact with Rodgers throughout the case and that she had completed all services required of her. He said that he last spoke with Rodgers six weeks previously about C.R.'s coming home, and Rodgers stated that C.R. "would have to admit to what he had done before she would let him come back home." Rodgers explained to Watson that C.R. would get up in the middle of the night and steal food out of the refrigerator and that "[h]e needed to admit to what he had done." Watson testified that Rodgers had not visited C.R. because of the no-contact order and that Rodgers was scheduled to go to

SLIP OPINION

court on her criminal charges in April. Finally, Watson said that C.R. was doing well at school and was "usually happy . . . like a normal kid" around his foster parents.

Sylvia Ware, a DHS supervisor, testified that she was familiar with this case and had spoken with Rodgers about the progression of the case. Ware stated that Rodgers admitted spanking C.R. with a belt. Rodgers also told Ware that C.R. could come home and that she would "put the belt away," but "he needs to remember that the belt can always come back out." Ware was also concerned with Rodgers's statement to her that C.R. had a "demon possessed spirit."

Tyler Dunegan, C.R.'s foster dad, testified that C.R. was placed with his family in October 2014 and that he wished to adopt C.R. Tyler stated that C.R. has minor behavioral problems, "typical ten-year-old boy behavior; but nothing out of the ordinary." Tyler explained that when he first arrived, C.R. had frequent nightmares and did not sleep well, but that has improved. Tyler said that he and his wife Carolyn take C.R. to the Calvary Baptist Church in Osceola and that C.R. "loves the church family." He also stated that C.R. likes to play sports and is very social. He described C.R. as "happy" and "full of joy." Tyler also explained that he and his wife now have two other foster children, siblings who are three years old and four months old, and that C.R. and the other children "call each other brother and sisters."

Carolyn Dunegan, C.R.'s foster mom, testified that in April 2015, she and C.R. were in Wal-Mart and C.R. saw Rodgers, which caused him to have a panic attack. Carolyn stated that she has had no issues with C.R. lying to her or stealing. She explained that he was quiet when he first arrived in their home and has always been "very polite"

and "very loving." She said that now "he loves life and loves doing things and being active and everything that we do." Carolyn said that he loves the other foster children in their home and that he is also close to the Dunegans' extended family. She confirmed that she and her husband were interested in adopting C.R.

Rodgers testified that C.R. had been removed from her home after an incident at a bus stop in October 2014. Rodgers said that C.R. had attempted to take some candy from a "city worker," that she had yelled at him, and that she had asked a friend for a belt. At that point, the circuit court interrupted the testimony, reminded counsel of Rodgers's pending criminal charges, and asked if counsel wanted to let Rodgers continue to describe the incident, to which counsel responded, "No." Continuing her testimony, Rodgers said that she had taken C.R. to a therapist in April 2014 because he had been lying to her and getting in trouble at school. She said he would get up in the middle of the night and get food out of the refrigerator and then lie about it. She also described an instance in which he had stolen a toy from a store. She denied having disciplined him for lying or stealing; she said that she employed "talk therapy with him." With regard to her "demon" comment to Sylvia Ware, Rodgers said that she "didn't state it the way you said it." When asked if she feels that C.R. "has the demon in him," Rodgers said, "I believe he have whatever that's in him that's in him." She also stated that she was "willing for C.R. to come home" and that she was "not planning to using a belt" in the future.

On cross-examination, Rodgers explained that C.R. had moved into her home in April 2013 and had some developmental delays. She said that he had problems with

speech and fine motor skills and did not know how to write or brush his teeth.  She also stated that he had hostile and inappropriate behavior with other children.

Ten-year-old C.R. testified and described his foster dad as "nice" and "awesome." About his foster mom, he said that she "gets me things and loves me."  He said that he went to live with the Dunegans because he "had got abused."  He identified Rodgers in the courtroom and said that he had met her at a restaurant before he went to live with her.  He thought she was nice at first but "just didn't like the way she looked at me when she laughed, she had an angry face."  He said that once he began living with her, she was no longer nice, and he became scared of her.  He explained that Rodgers had hit him with a stick or a belt every day, usually on his legs and back.  He said there had been one time that she hit him in the face, which was the incident at the bus stop.  He explained that he had taken a piece of candy from a man from church and that "she came with a belt and she started hitting me with it."  He also stated that Rodgers had locked him in his bedroom at night, which scared him and forced him to use the bathroom on himself if he had to use the bathroom, and she would then hit him with the stick the next morning. He also explained that he had not been allowed to get any food from the kitchen or he would be hit with the stick.  He confirmed that he wanted to stay with the Dunegans and that he was scared of going back to Rodgers.

On cross-examination, C.R. agreed that he used to get in trouble at school for backtalking.  He also agreed that he used to scratch and bruise himself because he "used to get mad."  He also said that he had gotten paddlings at school that left bruises.

After DHS rested and Rodgers moved for a directed verdict, which was denied, Rodgers returned to the stand and testified that she and C.R. had a good relationship and that she had protected him. She said that when he came to live with her, he had "emotional difficulties" and displayed both suicidal and homicidal behaviors. She also stated that he had been on medication for attention deficit hyperactivity disorder, conduct disorder, and oppositional defiant disorder. She said that she learned from his medical records that he had an acute psychiatric break in 2011 that had been treated at Bridgeway. She denied that she had ever abused C.R. She testified that she wanted C.R. to live with her again, that she felt she was a good parent, and that she had plans for C.R. to be treated by a cognitive therapist and to start karate classes.

At the conclusion of the hearing, the circuit court orally granted the petition to terminate Rodgers's parental rights. The court entered a written order on 28 March 2016 terminating Rodgers's parental rights based on two statutory bases: (1) the juvenile has been adjudicated dependent-neglected and continued out of the custody of the parent for twelve months, and despite a meaningful effort by DHS to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent; (2) the parent has subjected the child to aggravated circumstances. On the "failure to remedy" ground, the court found that

> [e]ven though the mother has complied with the Case Plan and Court Orders and completed services, this is not dispositive of the issue in this ground pursuant to appellate case law. There are still safety issues and fears expressed by the child if he is returned to the mother. The child was seriously physically abused according to the evidence.

On the "aggravated circumstances" ground, the court stated, "The court finds aggravated circumstances as pled and based on the credible evidence at the hearing, the court finds by clear and convincing evidence based on the testimony of the child at the hearing that he has been chronically abused, physically and emotionally." The circuit court made clear that its order was based on the totality of the evidence and credibility findings, specifically the testimony of C.R. and Chelsea Fife. Rodgers filed a timely appeal from this order.

We review termination-of-parental-rights cases de novo. *Hune v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 543. Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* Grounds for termination of parental rights must be proved by clear and convincing evidence. *Id.* Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Id.* The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to assess the witnesses' credibility. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).

The goal of Arkansas Code Annotated section 9-27-341 (Repl. 2015) is to provide permanency in a minor child's life in circumstances in which returning the child to the

family home is contrary to the minor's health, safety, or welfare, and the evidence demonstrates that a return to the home cannot be accomplished in a reasonable period of time as viewed from the minor child's perspective. *Id.*; Ark. Code Ann. § 9–27–341(a)(3). Parental rights may be terminated if clear and convincing evidence shows (1) that it is in the child's best interest and (2) that statutory grounds have been proved. *Hune*, *supra*.

On appeal, Rodgers challenges both statutory grounds for termination found by the circuit court. She does not challenge the circuit court's best-interest finding. The first ground, the "out-of-custody for twelve months and failure-to-remedy" ground, requires the circuit court to find that "a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent." Ark. Code Ann. § 9-27–341(b)(3)(B)(i)*(a)*.

On this point, Rodgers notes that C.R.'s adjudication was based on "neglect due to cuts/welts and bruises on the juvenile's arms, legs, and back." She also notes that there was no finding of abuse in any proceeding leading up to the termination hearing and that she had not been convicted of any crime at the time of the termination hearing. Nevertheless, the circuit court found that there were "still safety issues and fears expressed by the child" and that C.R. was "seriously physically abused." Rodgers argues, however, that abuse was not a basis for removal and that she "cannot be required to remedy a cause for removal that the circuit court did not find at the adjudication hearing." She contends that the circuit court "had no authority to retroactively find that Darlene abused [C.R.]

and that abuse was the basis for the adjudication." She argues that the adjudication was based on neglect, so that was what she was tasked with remedying, and there was no evidence that she had failed to remedy any issues of neglect.

In response, DHS notes that there are two problems with Rodgers's argument: (1) the statute does not pertain to remedying the *cause* for removal but the *conditions* of removal, and (2) the scope of the "conditions that caused removal" is not necessarily equivalent to, or limited by, how the circuit court characterizes its finding of dependency-neglect in the adjudication order. DHS explains that according to the initial removal and adjudication order, the conditions that caused removal were the presence of numerous unexplained injuries on C.R.'s body, C.R.'s fear of his mother, and the court's concern for his safety. And, citing the testimony at the termination hearing, especially C.R.'s and Fife's testimony, DHS argues that the circuit court correctly found that the conditions that had caused removal had not been remedied. According to DHS, both Fife and C.R. testified that he was still afraid of Rodgers, and this evidence supported the circuit court's finding that "safety issues and concern for the child" still exist.

In support, DHS cites *Wheatley v. Arkansas Department of Human Services*, 2016 Ark. App. 438, ___ S.W.3d ___, in which a nearly identical argument was made by the appellant. In that case, Wheatley argued that the circuit court made a mistake of fact in its order and that she could not be required to remedy an issue she was never found to have committed. Specifically, Wheatley argued that there was no finding of abuse in the adjudication order, so the circuit court erred in later basing termination in part on abuse perpetrated by Wheatley. This court disagreed with Wheatley's argument and stated,

10

> We are not left with a definite and firm conviction that the trial court's finding was a mistake or that in making its finding it was operating under a mistaken belief that the court had earlier found Randi to be the actual perpetrator of K.W.'s abuse. Rather, it was operating under the conviction that, regardless of whether Randi had been the actual abuser or had failed to protect her children from the abuse, they were not safe in her care.

*Id.* at 5. DHS asserts that the circuit court made a similar determination in this case and should be affirmed.

In reply, Rodgers continues to insist that "[s]he cannot be required to remedy an issue or condition that was not determined to exist at the time of the adjudication hearing" and cites *Jackson v. Arkansas Department of Human Services*, 2013 Ark. App. 411, 429 S.W.3d 276, in support. In *Jackson*, at the time the child was taken from his mother's custody, the father's whereabouts were unknown, and he did not participate in the case until the termination hearing. On appeal, the father argued that the twelve-month failure-to-remedy ground could not apply to him because his conduct did not cause the removal, and this court agreed.

We find no error on this point and affirm. Rodgers cites no authority for the proposition that the circuit court is limited to determining only whether the stated basis for the adjudication has been remedied at the termination hearing. The statute requires that the "the conditions that caused removal" be remedied, not just the named basis for the dependency-neglect adjudication. Based on the testimony presented, especially C.R.'s testimony, which the circuit court found credible, the circuit court found that the conditions that had caused removal had not been remedied, specifically "safety issues and fears expressed by the child if he is returned to the mother." These conditions existed at the time of removal and continued to exist at the time of termination.

11

The case cited by Rodgers, *Jackson*, is clearly distinguishable; in that case, the child was not in Jackson's custody when the removal occurred, meaning that Jackson could not be responsible for the conditions that had caused removal. Here, C.R. was clearly in Rodgers's custody at the time of his removal.

Progress toward or even completion of the case plan is not a bar to termination of parental rights. *Weatherspoon v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 104, 426 S.W.3d 520. What matters is whether completion of the case plan achieved the intended result of making a parent capable of caring for his or her child; mere compliance with the directives of the court and DHS is not sufficient if the root cause of the problem was not adequately addressed. *See Lee v. Ark. Dep't of Human Servs.*, 102 Ark. App. 337, 285 S.W.3d 277 (2008). In this case, we hold that the circuit court did not err in determining that the root cause of the problem was still present and that termination on this statutory basis was proper.

We also hold that there was sufficient evidence presented to support the second ground for termination, which was aggravated circumstances. For this ground, the circuit court is required to find that the parent has subjected any juvenile to aggravated circumstances, meaning the juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)* & *(B)*.

The circuit court found that C.R. had been chronically abused, both physically and emotionally, but Rodgers argues that the evidence was insufficient to support such a

finding. She asserts that the circuit court based this finding on C.R.'s testimony and denies that his testimony established any abuse and certainly not chronic abuse. However, we note that the court's finding was based not just on C.R.'s testimony, but on the totality of the evidence, and especially Fife's testimony, which the court specifically noted and found credible. We also note that C.R.'s testimony alone is sufficient to support a finding of abuse; daily beatings with a stick or a belt certainly support a finding of "extreme or repeated cruelty," which constitutes abuse under the statute. The circuit court is in a superior position to observe the parties before it and judge the credibility of the witnesses, and we will not second-guess that determination. *Dinkins*, *supra*.

Affirmed.

GRUBER and HOOFMAN, JJ., agree.

*Tabitha McNulty*, Arkansas Public Defender Commission, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.