
# ARKANSAS COURT OF APPEALS
DIVISION I
No. CV–16–920

CLARISSA BRANDAU

APPELLANT

V.

ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN

APPELLEES

OPINION DELIVERED: FEBRUARY 15, 2017

APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, EIGHTH DIVISION
[NO. 60JV-14-1533]

HONORABLE WILEY A. BRANTON, JR., JUDGE

AFFIRMED

## ROBERT J. GLADWIN, Judge

Clarissa Brandau appeals the termination of her parental rights to her two children, G.R. (born August 29, 2006) and A.R. (born September 22, 2008). She argues that the Pulaski County Circuit Court clearly erred in finding that it was in the children's best interest to terminate her parental rights and there was insufficient evidence to support the grounds for termination alleged in the Arkansas Department of Human Service's (DHS's) termination petition. We affirm.

### I. *Facts*

DHS filed a petition for ex parte emergency custody and dependency-neglect on November 17, 2014, alleging that the two children lived with their mother and had been

subjected to neglect and parental unfitness.[1]  The attached affidavit reflects that DHS had received a hotline call on November 3, 2014, alleging that the children had slept in their car with Brandau, who had been kicked out of a shelter where they had been staying.  The children were interviewed at school on November 13, 2014, and both said that they had recently spent the nights in their mother's car when they were not at a shelter, motel, or friend's house.  When DHS interviewed Brandau, she admitted living in her car, and she tested positive for methamphetamine, amphetamine, and marijuana.  The children were placed on a seventy-two-hour hold by DHS on November 12, 2014, due to their inadequate housing and Brandau's drug abuse.  DHS noted in the supporting affidavit that there had been three unsubstantiated reports in 2014 and a previous case that had been closed in 2009.  As a result of the petition, an ex parte order for emergency custody had been filed on November 18, 2014, granting custody to DHS.

An order filed December 16, 2014, found probable cause that the emergency conditions that had caused removal of the children from Brandau's custody continued and that it was necessary for the children to remain in DHS custody.  Brandau was granted supervised visitation, and the circuit court had no objection to the children being placed with Thomas Redd, their putative uncle.  Brandau was ordered to submit to random drug-and-alcohol screens and a psychological evaluation.

An adjudication order was filed on January 27, 2015, finding that the children were dependent-neglected and that the allegations in the petition were true and correct—Brandau

---

[1]Sean Redd was named as the putative father in the petition, and his parental rights were ultimately terminated in this case.  However, he is not a party to this appeal.

SLIP OPINION

had subjected the children to neglect; the family was homeless; the children experienced uncertainty as to where they would be sleeping; the family mostly slept in a car; the situation resulted in bad hygiene for the children; and Brandau used meth, amphetamines, and marijuana. The circuit court found that returning the children to Brandau's custody would be contrary to their welfare. The goal of the case was reunification. Brandau had tested positive for amphetamine, methamphetamine, and THC on November 12, 2014; positive for THC on November 20, 2014; and positive for THC on December 11 and 22, 2014. Brandau was ordered to submit to a psychological evaluation and to follow the recommendations; submit to a drug-and-alcohol assessment and follow the recommendations; attend counseling; submit to random drug-and-alcohol screens; and obtain and maintain stable housing and income.

A review order filed May 5, 2015, found that the case plan was moving toward an appropriate permanency plan, and the goal of the case continued to be reunification. The circuit court specifically held that Brandau had made an effort to comply but stated,

> It remains to be seen whether any measurable progress has been made. The court is distressed that the mother thinks that no services have been provided to her and that there has been no case plan developed. The case plan was entered into evidence at the last hearing. It seems as if the mother wants to blame others. Eventually the mother acknowledged having received certain services. The court expects the mother to do certain things on her own.

> Testimony indicated the following: The mother is to be assessed for medication. The mother works at Big Orange and sleeps at a male friend's house on the couch. The mother has saved about $5000 but owes at least that much, some to Forrest Place Apartments with which she is trying to work on a settlement of accrued rent due. Also the mother owes sum(s) due to traffic violations(s).

SLIP OPINION

The circuit court also found that DHS had made reasonable efforts to provide services to achieve reunification, including transportation, bus passes, drug screenings, PACE Evaluation, medical services, provisional foster home, and board payments.

The permanency-planning order filed on October 5, 2015, found that it was in the children's best interest to remain in DHS custody, and the goal of the case continued to be reunification. The circuit court found that Brandau did not "follow through with individual counseling and that is a real setback." The circuit court noted Brandau's complaints that the therapist was "getting into her business" and advised that it was normal for a therapist to ask questions regarding the patient's life. The circuit court recognized that Brandau's cessation of therapy was due to personal conflicts with the therapist but stated that "the manner in which the mother reportedly lost her job at Big Orange raises some question about whether the mother's fundamental issues have been addressed." The circuit court noted Brandau's expenses ($870 per month rent) and income ($1400 per month plus income from doing massages). Brandau was allowed day visits if her hair-follicle drug test was negative, and if no further concerns emerged, the circuit court would entertain an agreed order for overnight visits. DHS was to make a referral for Brandau to attend individual counseling, and DHS was found to have made reasonable efforts to provide services.

The permanency-planning order filed on January 14, 2016, found that the children should remain in DHS custody, and a court report was admitted reflecting Brandau's hair–follicle drug screen positive for marijuana on September 14, 2015, a positive urine drug screen on October 14, 2015, a negative drug screen of October 15, 2015 (obtained

independently by Brandau), and a negative urine drug screen of December 10, 2015. The

goal of the case continued to be reunification. The circuit court noted in its order,

> The main concern with the mother is her mental health issue and whether she can stay off of nonprescription drugs, whether she can maintain mental and emotional stability, and maintain employment and appropriate housing. The court believes that the mother is capable but unsure whether she will achieve these objectives or if she did achieve them, whether she would continue to do so.
>
> Testimony included the following: The mother continues to reside at . . . Little Rock, Arkansas. Since the last hearing, the mother has changed jobs. She now works at Teletek as a customer service representative. The mother's work schedule has caused the mother to miss some counseling appointments and visitation, but once she moves beyond the "new worker" period, this shouldn't continue to be an issue. The mother is prescribed Lithium for anxiety but has not taken it in two months and intends to inquire about a possible change of medication.

The circuit court accepted DHS's recommendation and authorized three unsupervised day

visits and, depending on whether things went well, weekend visits until the next court

hearing. Brandau was ordered to take medications as prescribed. The circuit court also

found that DHS had made reasonable efforts to provide services.

A joint motion to stop weekend visits was filed on March 11, 2016, by the attorney

ad litem and DHS. The motion alleged that the goal of the case had been changed to

termination of parental rights at the permanency-planning hearing held on March 8, 2016.

The motion recited testimony from Samantha Parsons, the family service worker, stating

that Brandau had major mental-health problems and was going to therapy only because the

circuit court had ordered it. The circuit court made a finding that Brandau had not

benefited from therapy. There was further testimony that Brandau had stopped taking her

medications prescribed for her mental health. Further, Brandau was not giving her child

medication during the weekend visits, even though she had repeatedly been instructed to

do so. The children advised that they had seen their mother stealing drinks in a store and had men come to her apartment and go into her bedroom for periods of time. Parsons also had received information that Brandau was using drugs and having other people give her urine to submit for drug screening.

The permanency-planning order from the March 8, 2016 hearing was filed on March 23, 2016. The goal of the case was changed to termination of parental rights, and the order recited that Brandau had failed to appear for the hearing. The circuit court found that no material progress had been made toward reunification in that Brandau had not been consistent with taking her medication as prescribed, had not been keeping up with her therapy appointments, and had little insight as to the need to attend treatment.

DHS filed a petition for termination of parental rights on April 27, 2016, alleging five grounds for termination under Arkansas Code Annotated section 9-27-341 (Repl. 2015):

1.) That a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent. (*See* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*);

2.) That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent placement of the juvenile in the custody of the parent (*See* Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*);

3.) That the parent is found by a court of competent jurisdiction, including the juvenile division of circuit court, to have subjected any juvenile to aggravated

circumstances (Aggravated circumstances means a juvenile has been abandoned, chronically abused, subjected to extreme or repeated cruelty, sexually abused, or a determination has been made by a judge that there is little likelihood that services to the family will result in successful reunification) (*See* Ark. Code Ann. § 9-27-34l(b)(3)(B)(ix)*(a)(3)(A)* and *(B)(i)*);

4.) That a parent has abandoned a juvenile. (*See* Ark. Code Ann. § 9-27-341(b)(3)(B)(iv)); and

5.) That the juvenile has lived outside the home of the parent for a period of twelve (12) months, and the parent has willfully failed to provide significant material support in accordance with the parent's means or to maintain meaningful contact with the juvenile (*See* Ark. Code Ann. § 9-27-341(b)(3)(B)(ii)).

At the hearing on DHS's petition to terminate held on June 14, 2016, Danyetta Pride, an adoption specialist, testified that the children are adoptable, that there are no major behavioral or medical issues, and that 137 adoptive homes in their database are willing to take the children together based on their characteristics. Pride also said that there is a relative who might be interested in adopting the children.

Samantha Parsons testified that she had been the caseworker and had performed drug screens on Brandau and that Brandau had completed a psychological evaluation, parenting classes, a drug-and-alcohol assessment, and outpatient drug treatment. She said that individual therapy and visitation were ongoing. She said Brandau had obtained and maintained housing and employment and had transportation but did not have a driver's license. Brandau had a three-bedroom apartment since October or November 2015. Parsons said that the children's father, Sean Redd, was added to the lease because Brandau's income alone was not sufficient, but she thought Redd lived in Idaho at that time.

Parsons thought that Brandau was having difficulty financially maintaining the apartment because she was also paying child support. She said that Brandau claimed the

children as dependents, even though she was advised not to do so. Brandau received an income-tax refund and used it to obtain transportation. She was also robbed by a man she had reconnected with on Facebook who had helped her move her bed. He stole her debit card and withdrew about $800 from Brandau's account. Parsons said that she discussed her concerns with Brandau about having a man in her home whom she had not seen in some time and advised her to file a police report. Parsons was also concerned that Brandau lived more than fifteen miles from her work and had not obtained transportation until recently. Parsons recommended that parental rights be terminated.

She said that Brandau had completed her services, but Parsons doubted whether she had benefited from them. She said that Brandau was doing only what the court wanted her to do regarding her mental-health issues and was not benefiting from therapy. She also stated that Brandau continued to use drugs, that she was self-medicating with marijuana, and that she was not taking her Lithium. She said that the children were doing well with their uncle and that they had been out of the home for over twelve months.

The hearing was continued on June 24, 2016, when Caroline Nardi, resident psychiatrist stationed at the local community mental-health center, testified that she saw Brandau one time for a medication-management appointment. She testified based on Brandau's file regarding her prescriptions for depression and anxiety and stated that her diagnosis was unspecified anxiety disorder, depressive disorder, cannabis dependence, as well as borderline personality disorder. She said that personality disorders mean that there is a pervasive pattern of instability of interpersonal relationships, self-image, and affects characterized with impulsivity.

Nardi said that Brandau was told to return two months after her initial diagnostic appointment, but she did not return for about six months and had not used the prescriptions. She was given different prescriptions in order to find a medication that worked for her symptoms of depression, labile mood, irritability, and insomnia. She was prescribed Lithium but stopped taking it in November 2015. In January 2016, a new prescription for mirtazapine, or Remeron, was provided to treat depression, anxiety, and insomnia. Clonazepam was also prescribed for a short term with no refills. Although asked to submit to a drug screen at that appointment, Brandau did not. However, Brandau did return in February, April, and May, but she did not attend her June 2016 appointment. Nardi said that the standard treatment for a borderline personality disorder is therapy and that a patient should be motivated to achieve wellness, but the medical record indicated that Brandau did not have any goals.

Dr. Hugo Morais testified that he was Brandau's psychologist at the Little Rock Community Mental Health Center. Their first session was September 18, 2015, but he was not her first therapist. He said her impetus for continuing therapy was to decrease anxiety and depressive symptoms and to comply with litigation requirements that she attend therapy. When he met with her again on September 25, 2015, they started with specific interventions, including psycho education regarding self-care, stress management, and a sleep–hygiene routine. When they met on October 9, 2015, there was no observable progress on any of those interventions. At that point it became clear to Morais that Brandau's primary goal for treatment was to impact the outcome of child–custody litigation.

Brandau did not return to therapy until March 2016, even though weekly appointments had been scheduled. She presented then as angry and wanted to discuss the fact that she believed that her parental rights had been terminated because of her therapy record. She indicated specifically that she had lost custody or had been negatively impacted by the last progress note on her file.

Morais testified that there had been no progress made by March 18, 2016, as far as her treatment goals, issues, and interventions. Morais informed Brandau that her only stated goal—to get her kids back—was not an appropriate goal for psychotherapy, consistently. When the trial court asked the doctor whether he was drawing a distinction between someone who wanted to improve their mental-health condition and someone who says, "well, in order for me to get my kids back, the judge said I've got to get some treatment," Morais said yes. He explained,

> Not addressing psychiatric concerns and focusing more on her litigation as opposed to saying by addressing my mental-health concerns, I would be more able to comply with the court requirements and do that. That wasn't the case. The focus became just on, I need to get custody back of my children; versus I'm experiencing problems and anxiety and depression and borderline personality disorder. Therefore, I need to comply with treatment so that those symptoms are abated. Therefore, I can better function.

Morais said that no progress had been made in the following week's meeting on March 25, 2016, and that by then, given the difficulty with engagement in psychotherapy, there was evidence to indicate that there was no longer a medical necessity that would be addressed in psychotherapy. It was decided that individual psychotherapy was no longer indicated and that Brandau would likely benefit from group therapy. He said he discussed

with her the importance of abstaining from substances, meaning cannabis, and that she should make that a stated goal of psychotherapy. He said that she denied any substance use.

Dr. Paul Deyoub, a forensic psychiatrist, testified that he evaluated Brandau and diagnosed her with cannabis-use disorder; methamphetamine-use disorder; cyclothymic disorder; and unspecified-personality disorder. Cyclothymic disorder is a mood disorder that is less significant than bipolar disorder and is a combination of depression and excitability. He also diagnosed her with unspecified personality disorder based on her test results that were significant for high levels of emotional distress and parenting problems. He gave the unspecified-personality-disorder diagnoses because, over the course of ten years since she was at least nineteen, she had difficulty in relationships, managing her children's emotional problems, and drug use. He thought her behavior should be a bit more destructive for her to fall into the borderline-personality-disorder category. He chose unspecified as opposed to borderline because Brandau had a mixture of traits—dependency; inadequacy; drug use; and emotional liability. He said that the differential diagnosis between borderline and unspecified-personality disorder was not a big issue.

Deyoub said that he recommended to Brandau that she discontinue any drug use, that she needed to have a place to live, and that she needed outpatient drug treatment, outpatient mental-health treatment, parenting classes, and medication evaluation. He said that progress for her would be that she would be calmer and more stable and in a better mental state than when he first saw her. He admitted that it would be progress if she held a job for eight months, was a stable living situation, took parenting classes, went through outpatient drug treatment, and maintained a relationship with a mental-health facility to

address her mental-health needs. He said that almost anything would be an improvement from the last time he saw her.

Deyoub said that he would be concerned if there had been reports that Brandau was complying with mental-health services to only "put a check off" on the box and that she was not motivated to change her mental-health condition. He said that her diagnosis was a character disorder that had to be addressed and treated because the symptoms were repetitive and persistent. Otherwise, she would repeat the same mistakes—dependency on men and feelings of inadequacy.

Brandau testified that she had a one-year lease on a three-bedroom flat that was renewable "pretty soon." She said that there had been concerns with the father's family knowing her address. She admitted that the father was on the lease but stated that he claimed not to know the address. She said that she might not renew the lease on the same apartment in order to avoid the father's knowing her address. She described her job at Teletek doing customer service over the telephone and said that she had worked there since October 2015. She said that her job performance was one of her top concerns since she had been hired and that she has done very well there. She said that she received one of the biggest bonuses for the last quarter of 2015 and was asked to get her license for 2016. She said that she bought a car in March 2016 and that she had a driver's license and was not "fully aware of it being suspended. I'm in the process of getting it unsuspended." She then produced a driver's license dated May 11, 2016.

Brandau agreed that mental-health issues were driving the case. She said that she began to get services for her mental health at the lowest point in her life, which was before

the children were taken into DHS custody. She had a fire, a burglary, a miscarriage, and a break-up with the children's father. She said that she did not have the ability to focus on herself when she entered the shelter at the Women's Center at the start of the case. That was two days before the children were taken into custody, and they were sleeping in a parking lot. She was trying to fix everything at once, so she went to the Little Rock Community Mental Health Center to get therapy.

Brandau admitted that she was positive for THC and methamphetamine at the time. She said that she had not tested positive for methamphetamine since the case had begun, but she had tested positive for THC. She said that she did not smoke marijuana, but took edible medical marijuana. She denied stating that she was going to stop taking medication and use marijuana instead. She said that she supports medical marijuana and that the Lithium had been a problem due to side effects. She said she had told her caseworker that there were no side effects with medical marijuana.

Brandau said that when she would go to her therapy session with Morais, she would be coming from a visit at DHS and would be very emotional. She said that she felt that she had benefited from services, especially by obtaining a place to live. She stated that the children have their own beds for the first time. She said that she was current on her child-support payments and that she had her own vehicle. She thought that the only barrier to getting her children back was the "mental issue" that was coming up a lot.

She said that the children belong with her, that she loves them, and that she feels that she could address the mental diagnosis and continue to go to therapy. She said that her goal was to be able to manage her anxiety without "pharmaceutical medication." She said that

she was not just "checking boxes" but had made a lot of progress. Her life had changed from living in a car to having her own apartment, a job, paying child support, and being able to pay her bills and provide for her children.

On cross-examination, Brandau explained that she had set up the appointment at the Little Rock Mental Health Center before the children were taken on the seventy-two-hour hold but went to the appointment after the children had been taken. She also insisted that the last time she had used marijuana was in October 2014 but admitted that she was positive on a hair-follicle test in March 2016. She also admitted that she was not sure whether her driver's license was currently suspended. She said that Sean Redd had been physically abusive toward her in the past and had knocked out some of her teeth, and she said that she had told Dr. Deyoub that she was thinking of moving to Idaho Falls to live in Redd's vicinity so he could be in the children's lives. She said that she would go to Idaho to put her children's feelings before her own. On redirect examination, Brandau admitted that she had said she would move to Idaho in December 2014 but stated that she would not move to Idaho now.

Finally, Caroline Banks, Samantha Parsons's supervisor, said that on March 17, 2016, Brandau stated that she had been prescribed clonazepam for anxiety, but it was too expensive and that she smokes pot.

The circuit court terminated Brandau's parental rights by order filed July 22, 2016, pursuant to each of the grounds as alleged by DHS in its petition.[2] The termination order

---

[2] The first three grounds alleged in DHS's petition applied to Brandau, and the fourth and fifth grounds applied to Sean Redd, the father of the children.

reflects the findings made in previous orders as set forth above and emphasizes the circuit court's concern about the mother's credibility regarding her marijuana use, her lack of progress in individual counseling, and her justification for having contact with Sean Redd.

Pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(a)* (failure to remedy), the circuit court found that Brandau had made improvement but continued to lack insight, judgment, credibility, and trustworthiness. The circuit court's order states,

> The mother has been concerned about the need for her to take her mental health medications. In a short time, the mother would return to the use of nonprescription drugs to self-medicate. The court believes that the mother wants her children back. However, if returned, the children would be at risk of a return to the same circumstances from whence they were removed. While the mother testified that she now has obtained a car, she also testified that it needs thousands of dollars in repair which is a foreshadowing of the past.

Pursuant to Arkansas Code Annotated section 9-27–341(b)(3)(B)(vii)*(a)* (subsequent factors), the circuit court found that the same reasons set forth under the first ground applied to this second ground. The circuit court stated, "The mother has not benefitted from services." The third ground, Arkansas Code Annotated section 9-27-341(b)(3)(B)(ix)*(a)(3)* (aggravated circumstances), applied to Brandau as follows:

> The case has been open for over a year and a half. Given the mother's mental health issues, lack of success in treatment and failure to benefit from services, it is unlikely that services to the family will result in successful reunification within a reasonable period of time as measured from the children's perspective and consistent with their developmental needs.

The circuit court found by clear and convincing evidence that it was in the children's best interest to terminate parental rights, considering the likelihood that they would be adopted and the potential harm to their health and safety if returned to their parents. The circuit court found, "It would only be a matter of time before the mother would revert to

past practices which contributed to conditions that caused removal."  Brandau filed a timely

notice of appeal, and this appeal followed.

## II.  *Applicable Law*

This court recently stated as follows:

> We review termination-of-parental-rights cases de novo. *Dinkins v. Ark. Dep't of Human Servs.*, 344 Ark. 207, 40 S.W.3d 286 (2001).  At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights; these must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341. In making a "best interest" determination, the trial court is required to consider two factors: (1) the likelihood that the child will be adopted, and (2) the potential of harm to the child if custody is returned to a parent. *Id.* Adoptability is not an essential element but is rather a factor that the trial court must consider. *Tucker v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 430, 389 S.W.3d 1. Likewise, the potential harm to the child is a factor to be considered, but a specific potential harm does not have to be identified or proved by clear and convincing evidence. *Pine v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 781, 379 S.W.3d 703. The potential-harm analysis is to be conducted in broad terms. *Id.* It is the "best interest" finding that must be supported by clear and convincing evidence. *Id.* The appellate inquiry is whether the trial court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *J.T. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997). Credibility determinations are left to the fact-finder. *Schaible v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 541, at 8, 444 S.W.3d 366, 370.

*Villaros v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 399, at 4–5, 500 S.W.3d 763, 766.

## III.  *Best Interest*

Brandau argues that the circuit court clearly erred in finding that it was in the

children's best interest to terminate her parental rights.  She does not challenge the evidence

that her children are adoptable.  However, she maintains that, even with such wide latitude

allowed in evaluating potential harm, there is still insufficient evidence to support a

conclusion that the children faced a substantial risk of harm if returned to her custody.

Brandau points out that the circuit court acknowledged that she had made progress but then repeatedly opined that it did not believe she could "sustain improvements" that she had made. This belief hinged on concerns about her credibility as well as her mental health. She notes that the circuit court found in its termination order that borderline personality disorder is a chronic condition, notwithstanding the testimony of Dr. Nardi. Brandau argues that Dr. Deyoub did not agree that she suffered from borderline personality disorder because he did not see the destructive behavior associated with it. Further, she argues that Dr. Deyoub thought she had progressed in terms of maintaining a home and a job and completing parenting classes, outpatient drug treatment, and "her relationship with a mental-health facility." She points out that Dr. Deyoub testified that he believed Brandau had the capacity to make a full rehabilitation, that she is of average intelligence, and that if she was determined to be free from drugs and to get something out of therapy to get her children back, she had the potential to do it. She contends that it is not unusual, per Dr. Nardi's testimony, that patients have to try multiple medications.

Brandau argues that full compliance with a case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Camarillo-Cox v. Ark. Dep't of Human Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005); *Cole v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 203, 394 S.W.3d 318. Brandau maintains that the evidence showed that she had become a stable, safe parent. She went from being homeless to maintaining an apartment and a job for eight months. She contends that almost a year of positive accomplishments indicates that she was ready to reunite with her children. She also argues that two positive drug screens, viewed in the context of the entire case, did

not demonstrate sufficient proof of potential harm. She also contends that DHS's own

expert witness, Dr. Deyoub, admitted that not testing positive for methamphetamine since

the time he evaluated her in December 2014 would indicate progress on her part. She

argues that, given the bond she and the children share, it cannot be said that terminating her

parental rights was in the best interest of the children.

Based on our standard of review, we hold that clear and convincing evidence

supports the best-interest finding. Evidence supports DHS's argument that Brandau's lack

of insight into her mental-health diagnoses, inability to take responsibility for her therapy

and recovery, and her positive drug tests demonstrated that there was a real risk that she

would revert to past practices once judicial supervision was removed. The court is not

required to find that actual harm would ensue if the child were returned to the parent or to

affirmatively identify a potential harm. *Sharks v. Ark. Dep't of Human Servs.*, 2016 Ark. App.

435, 502 S.W.3d 569. The circuit court found that she lacked credibility and ultimately

believed she lacked insight into her mental illness. Credibility determinations are left to the

circuit court. *Villaros, supra.* Accordingly, we affirm the circuit court's determination that

it was in the children's best interest to terminate parental rights.

IV. *Insufficient Evidence to Support Grounds*

A. Failure to Remedy

Arkansas Code Annotated section 9-27-341(b)(3)(B)(i)*(a)*, provides grounds for

termination of parental rights:

> That a juvenile has been adjudicated by the court to be dependent-neglected and has
> continued to be out of the custody of the parent for twelve (12) months and, despite
> a meaningful effort by the department to rehabilitate the parent and correct the

conditions that caused removal, those conditions have not been remedied by the parent.

Brandau does not challenge that her children were adjudicated dependent-neglected or that they were out of her home for twelve months. She asserts that there was insufficient evidence to prove that she failed to remedy the cause of their removal. The causes alleged by DHS were her drug use and mental and emotional instability. The circuit court found that, despite the improvements she had made, she lacked insight, judgment, credibility, and trustworthiness. She argues that none of these deficiencies were the reasons for the children's removal. Brandau contends that the petition for dependency-neglect recites that she and the children were sleeping in a car and that she had tested positive for methamphetamine, amphetamines, and marijuana. She argues that the circuit court's finding that she lacked insight, judgment, credibility, or trustworthiness is not tantamount to a finding that she failed to remedy the homelessness or drug use.

She argues that the circuit court's finding that "if returned, the children would be at risk of a return to the same circumstances from whence they were removed" is based on little more than speculation. She contends that it is contrary to the undisputed evidence that she had remedied the issue of homelessness and employment. She claims that it is also undisputed that she had no subsequent tests that were positive for methamphetamine after the initial test. She contends that the positive tests for marijuana and her admission that she had taken edible marijuana do not support the circuit court's findings, because the circuit court did not make a finding that she failed to remedy her drug use. She contends that the circuit court's finding that she lacked credibility concerning her testimony of marijuana use is not the same as finding that she failed to remedy the conditions that caused removal.



Therefore, she maintains that this ground cannot serve as a basis for affirming the termination order.

B.  Subsequent Factors

Arkansas Code Annotated section 9-27-341(b)(3)(B)(vii)*(a)* provides as follows:

> That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.

DHS alleged that Brandau had failed to substantially comply with the case plan and court orders, thus demonstrating an incapacity or indifference to remedy barriers to placement.  The circuit court found that Brandau had failed to benefit from services.  She argues that the circuit court did not make a finding that she had failed to comply with the case plan or court orders; rather, it found that she did not benefit from the services she had completed.

Brandau argues that, even if the circuit court's order is construed to encompass an actual subsequent factor, there was insufficient evidence to prove that she manifested the incapacity or indifference to remedy any subsequent issues.  She contends that the record supports that she availed herself of services and completed the difficult task of moving from living in a car to maintaining a job and a three-bedroom apartment, paying her child support and her bills.  She argues that there was inadequate proof to establish that she is indifferent or incapable of remedying any subsequent factors.

C. Aggravated Circumstances

Arkansas Code Annotated section 9-27–341(b)(3)(B)(ix)*(a)(3)(A)* and *(B)(i)* provides

as follows:

> The parent is found by a court of competent jurisdiction, including the juvenile
> division of circuit court, to:
> . . . .
>
> (3)(A) Have subjected any juvenile to aggravated circumstances.
>    (B) "Aggravated circumstances" means:
>       (i) A juvenile has been abandoned, chronically abused, subjected to extreme
>       or repeated cruelty, sexually abused, or a determination has been or is made
>       by a judge that there is little likelihood that services to the family will result
>       in successful reunification[.]

Brandau contends that DHS averred that it was unlikely that further services to her

would result in successful reunification or placement within a reasonable period of time.

She claims that she demonstrated, as argued above, that she benefited from services and that

there was no evidence to suggest that she would not continue to receive such benefits. She

argues that she has maintained enough mental stability to maintain an apartment and a job.

The caseworker's concern about mental stability was purely speculative, as was the circuit

court's finding that termination was warranted given her "mental health issues, lack of

success in treatment, and failure to benefit from services." She contends that, regardless of

credibility, she demonstrated the ability to maintain both a residence and a job.

DHS and the attorney ad litem contend that clear and convincing evidence supports

at least one ground for termination. They argue that the record clearly supports affirmance

under the "subsequent factors" and "aggravated circumstances" grounds. We agree. The

circuit court noted in its three-month review that "it remains to be seen whether any

measurable progress has been made . . . the Court expects the mother to do certain things

on her own." Five months later, at the permanency-planning hearing, the circuit court found that "the mother did not follow through with individual counseling and that is a real setback. The mother complained that the therapist was getting into her business." The circuit court also noted its concern regarding the manner in which Brandau lost her job at Big Orange, noting that it "raises some questions about whether the mother's fundamental issues have been addressed."

In September and October 2015, eight and nine months into the case, Brandau tested positive for marijuana. The court stated in its review order that the "main concern with the mother is her mental health issue and whether she can stay off non-prescription drugs, whether she can maintain mental and emotional stability, and maintain employment and appropriate housing." The circuit court noted that Brandau had been prescribed Lithium but had not taken it for two months and intended to inquire about a possible change of medication.

The goal of the case changed to termination of parental rights in March 2016, which was prompted by the circuit court's viewing of Brandau's mental-health records, which revealed she had not consistently taken her prescribed mental-health medications, had not been keeping up with therapy appointments, and "has little insight as to the need to attend treatment." At the termination hearing, there was testimony that Brandau had tested positive for marijuana on March 24, 2016, three months before the termination hearing. The caseworker testified that she had an issue with whether Brandau was benefiting from the services she had completed. Brandau's continued use of drugs and "mental and emotional instability" continued to concern DHS.

There was testimony at the termination hearing that Brandau had been diagnosed with borderline personality disorder by the Community Mental Health Center. Those symptoms can be difficulty with mood instability or affect and difficulty in interpersonal relationships. Caroline Nardi, the resident psychiatrist, testified about Brandau's extensive medication-management history and said that if Brandau had been using cannabis, it would be counterproductive to medication-management goals. She said a person with borderline personality disorder had to be really motivated in therapy and participate to get better.

Dr. Morais, Brandau's therapist, testified that she was more focused on getting her kids back than improving her mental health. Dr. Deyoub, a forensic psychologist who qualified as an expert, testified that he had evaluated Brandau and diagnosed her with cyclothymic disorder and unspecified personality disorder based on her instability over a long period of time. He did not feel that she was "borderline" or "antisocial" because there was not enough evidence of destructiveness, and he concurred that her record was consistent with a personality disorder. He said that if it were true that Brandau had not been following through with therapy and was using illegal drugs, then her prognosis would be poor. He also said that he would be concerned if any changes were motivated only by the court case and not "internal" or made with "real insight." Finally, Brandau testified that she had tested positive for drugs at least three times during the case.

The subsequent factors statute specifically provides that the inability or incapacity to remedy or rehabilitate includes, but is not limited to, mental illness, emotional illness, or mental deficiencies. Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(c)*; s*ee also Porter v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 680, 378 S.W.3d 246 (diagnosis of personality disorder,

which could not quickly be fixed, was sufficient evidence of "other factors" arising subsequent to the petition). Therefore, evidence of mental illness that arises subsequent to the petition for dependency-neglect can be relied on to demonstrate incapacity or indifference.

In her arguments, Brandau relies heavily on her own testimony. However, the circuit court as the trier of fact determines credibility of any witness's testimony. Her issue is with the weight the circuit court assigned to different testimony. This court defers to the circuit court's assessment. *Posey v. Ark. Dep't of Human Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). Further, progress toward, or even completion of, the case plan is not a bar to termination of parental rights. *Rodgers v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 569, ___ S.W.3d ___. What matters is whether completion of the case plan achieved the intended result of making a parent capable of caring for her child. *Id.* At the time of the termination hearing, the most significant issue, mental illness, still had not been adequately addressed after eighteen months.

The same evidence as discussed above supports the "aggravated circumstances" ground. After eighteen months of services, the circuit court concluded that Brandau had only been going through the motions and had not demonstrated substantial progress on the real root issue—her mental illness. At the time of termination, no mental health professional affirmatively recommended reunification—instead, all expressed concerns about her progress and noted her lack of change. Therefore, the circuit court's decision that there was little likelihood that continued services would result in successful reunification is not clearly

SLIP OPINION

erroneous. We are not left with a firm conviction that the circuit court made a mistake as to statutory grounds.

Affirmed.

ABRAMSON and VIRDEN, JJ., agree.

*Tina Bowers Lee*, Arkansas Public Defender Commission, for appellant.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Mary Goff*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor children.