Cite as 2022 Ark. App. 410

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-22-217

| | |
|---|---|
| DIANA DEJARNETTE<br><br>APPELLANT<br><br>V.<br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES, MINOR CHILD 1,<br>MINOR CHILD 2, MINOR CHILD 3,<br>AND MINOR CHILD 4<br><br>APPELLEES | **Opinion Delivered** October 19, 2022<br><br>APPEAL FROM THE DREW<br>COUNTY CIRCUIT COURT<br>[NO. 22JV-20-73]<br><br>HONORABLE TERESA FRENCH,<br>JUDGE<br><br>AFFIRMED |

## LARRY D. VAUGHT, Judge

Dianna Dejarnette appeals the order entered by the Drew County Circuit Court terminating her parental rights to her four children: Minor Child 1 (born January 27, 2012), Minor Child 2 (born April 13, 2014), Minor Child 3 (born July 18, 2015), and Minor Child 4 (born December 21, 2018).[1] On appeal, Dejarnette contends that the circuit court clearly erred in finding grounds supported termination and that termination is in the best interest of her children. We affirm.

---

[1]The order also terminated the parental rights of Otis Burks, the legal father of Minor Child 4. Burks did not appeal the order, and he is not a party to this action. Christopher Sanders was originally named in this action as the putative father of Minor Child 1, Minor Child 2, and Minor Child 3, but in November 2020, the circuit court found that Sanders had not presented evidence to establish significant contacts with the juveniles and that his rights as a putative parent had not attached. Accordingly, the circuit court dismissed Sanders from the case. He is not a party to this appeal.

On August 3, 2020, the Arkansas Department of Human Services ("DHS") filed a petition alleging that Dejarnette's children were dependent-neglected and seeking to remove them from Dejarnette's custody. In an affidavit attached to the petition, a representative of DHS summarized DHS's history with Dejarnette. From February 3, 2017, to April 6, 2018, a DHS case was open against Dejarnette for substance misuse. A second DHS case was opened against Dejarnette on February 19, 2020, for inadequate supervision. This second case was pending on July 28, 2020, when the Monticello police were called to the parking lot of an apartment complex and found Dejarnette having a psychotic episode. She was aggressive and confused, had disorganized speech, and was yelling in the presence of her children. The affidavit further states that Dejarnette had been diagnosed with schizophrenia but was not taking her medication as prescribed. Dejarnette was admitted to the hospital, and her children were removed from her custody.

On August 4, the circuit court entered an ex parte order granting DHS's request for custody of Dejarnette's children. Probable-cause and amended probable-cause orders were entered on September 1 and 9, respectively, continuing the children in DHS's custody and authorizing DHS to provide services to the family.

An agreed adjudication order was entered on November 5 wherein the court stated that the parties had stipulated that the children are dependent-neglected due to "inadequate supervision by placing the children in a dangerous situation." The court found that Dejarnette had improved since being released from the hospital, was cooperating with DHS, and was receiving services. The court ordered Dejarnette to sign medical releases, continue in-home family services with St. Francis Services ("St. Francis"), participate in counseling and

medication management with Delta Counseling Associates ("Delta Counseling"), comply with the recommendations of her drug-and-alcohol assessment, take her medication, and visit her children. The court set reunification as the goal of the case.

Review orders were entered on January 13, March 23, and May 23, 2021. The January 2021 review order found that Dejarnette had demonstrated marginal progress since the last hearing. Specifically, the court found that among other things Dejarnette (1) testified that she had received a black eye from Otis Burks, Minor Child 4's legal father, although she first falsely reported to DHS that she had been bitten by an insect; (2) was receiving pain medications from the hospital emergency room and from pain management, but she had not fully disclosed her prescriptions to either facility; (3) had failed to sign medical releases as ordered; (4) did not report her prescription drugs during her drug-and-alcohol assessment; (5) tested positive for THC on October 14, 2020; (6) could not provide sufficient urine for random drug screens on occasion; and (7) had not refilled her prescription medication. The court ordered Dejarnette to stay away from Burks, execute medical releases, provide an accurate medication list to all medical providers, submit to a new drug-and-alcohol assessment that included her prescription medications, comply with all assessment recommendations, and attend counseling and drug treatment. The court continued reunification as the goal of the case.

The March 2021 review order found that while Dejarnette had demonstrated meaningful progress and had partially complied with the case plan since the last hearing, there were still deficiencies. Dejarnette had transportation issues, so she had only two counseling sessions with her therapist, Josh Woods, who was assigned to Dejarnette in January 2021. Woods reported that he was unable to report any progress because of the limited number of

3

sessions with Dejarnette. The order also found that Dejarnette had been unavailable to DHS for random drug screens and home visits and had told DHS that "she has a life to lead and will not wait around the house for DHS to decide to come by and test her." Finally, Dejarnette reported that she had stopped taking some of her medications without her physician's approval. The circuit court ordered Dejarnette to attend day treatment at Delta Counseling; continue with individual counseling at Delta Counseling; take her medications as prescribed; and complete outpatient drug treatment with New Beginnings. Reunification remained the goal of the case.

In the May 2021 review order, the circuit court found that Dejarnette had not been compliant with the case plan since the last hearing. Specifically, the circuit court found that Dejarnette had missed several counseling sessions, she was not taking her medications as prescribed, she had failed to produce a urine sample for two drug screens, and she had failed to make herself available to DHS for random drug screens. Woods testified that he had still only had two sessions with Dejarnette since January 2021 and that she needs counseling and medication management to manage her schizophrenia. There was testimony that Dejarnette had moved to a women's shelter because she believed there were booby traps in a tree near her residence and because she was having issues with her neighbors and that she had purchased cameras to install around her residence for security purposes. The circuit court ordered Dejarnette to attend day treatment at Delta Counseling, complete outpatient substance-abuse treatment, attend all therapy appointments, and take her medications as prescribed. The court suspended urine tests and ordered a fingernail drug-screen test. The goal of the case was reunification.

A permanency-planning order was entered on September 10 wherein the court listed the issues Dejarnette was experiencing: she failed to maintain contact with DHS, she refused the fingernail drug test, she failed to attend visits with her children, she tested positive for buprenorphine in July, she failed to take her medications, she was rude to staff at New Beginnings, she failed to make progress in outpatient drug treatment, and she was still seeing and hearing things that do not exist. The court found that Dejarnette would benefit from inpatient residential care for her mental-health issues, and the court ordered her to admit herself to New Beginnings for ninety days of emergency inpatient treatment. The goal of the case continued to be reunification.

The circuit court entered a fifteen-month review order on October 4. The court found that the children had been removed from Dejarnette's custody due to her mental-health problems, and services had been offered to Dejarnette to address those concerns, but she had not demonstrated progress with her mental health. The court found that she had recently returned to the hospital for treatment and had failed to demonstrate progress sufficient for unsupervised visits with her children. The court found that there is no expectation that should services be continued, the end result would be any different. The court authorized DHS to file a termination petition.

On October 11, DHS filed a petition to terminate Dejarnette's parental rights. The petition alleged three grounds in support of termination: twelve-month failure to remedy by a

custodial parent,[2] subsequent other factors,[3] and aggravated circumstances.[4] DHS also alleged that termination was in the children's best interest.

The circuit court held a termination hearing on December 3. DHS caseworker Arnesha Edington testified that Minor Child 1, Minor Child 2, Minor Child 3, and Minor Child 4 were removed from the custody of Dejarnette on July 28, 2020, due to her delusional and psychotic behavior and that she was admitted to the hospital for treatment. Edington stated that while Dejarnette complied with portions of the case plan (she completed a parenting class, a psychological assessment, and a drug-and-alcohol assessment), Dejarnette failed to comply with other portions of the case plan. Dejarnette did not consistently take her medication, she did not complete sessions at Delta Counseling, she did not complete her outpatient treatment at New Beginnings, and she did not make herself available for random drug screens. Edington said that Dejarnette's failure to comply with the case plan prevented her from having unsupervised visits with her children and that she did not regularly attend supervised visits. Edington stated that Dejarnette still suffers from mental-health issues. Edington opined that Dejarnette does not have the capacity to parent her children and that she cannot be rehabilitated sufficient to remedy the situation that caused her children's removal. According to Edington, Dejarnette's parental rights should be terminated. Edington later testified that there are no barriers preventing the adoption of the children and that Joanna Taylor, the

[2]Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2021).

[3]Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*.

[4]Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)*.

6

maternal grandmother of Minor Child 1, Minor Child 2, and Minor Child 3, has indicated an interest in adopting the three children.

Teresa Simpson, a program assistant for DHS, testified that she began working with the Dejarnette family during the second protective-services case and continued working with the family after the dependency-neglect case was filed. Simpson stated that she attempted to perform thirty random drug screens on Dejarnette but completed only fifteen to twenty-five screens because she could not reach Dejarnette. Simpson stated that she had no concerns with Dejarnette's interactions with her children during visitation. However, Simpson added that Dejarnette failed to consistently attend visitation—she missed as many visits as she attended.

Brian Ramsay testified he and his wife had been fostering Minor Child 4 for six months and that Minor Child 4 is a typical three-year-old child. When asked if they were willing to adopt Minor Child 4, Ramsay said that they would consider adoption "down the road" if Minor Child 4 needed a home.

Jamie Palmer, the court appointed special advocate ("CASA"), testified that she had visited with the children multiple times during the case. In light of her observations, Palmer testified that Dejarnette's parental rights should not be terminated. Palmer said that Dejarnette is improving and that she is providing adequate care to her children during visits. Palmer admitted that she recommended in her CASA report that Dejarnette's parental rights be terminated, and she stated that opinion was based on information she had received from others that Dejarnette was not complying with the case plan. Palmer testified that she had observed Dejarnette's paranoia during the case, but Palmer had not observed that behavior

more recently. Palmer said that she would have concerns about Dejarnette's parenting abilities if she was not taking her medication and was not seeking treatment.

Stephanie Harper, one of Dejarnette's therapists, testified that Dejarnette had not been discharged from treatment at Delta Counseling for missing appointments. Harper admitted that Dejarnette had missed eleven appointments, but Harper said that Dejarnette had been seen by multiple therapists at Delta Counseling, which caused some of the missed appointments. Harper testified that she had one crisis call with Dejarnette in September and only one in-person session with Dejarnette the day before the termination hearing. Harper stated that Dejarnette is taking her medicine, keeping clean, attending day treatment, and keeping appointments. Harper further opined that while services will be needed, Dejarnette has the capability to be rehabilitated and to be a good parent.

Dejarnette testified that she completed all the recommended services except for four outpatient meetings at New Beginnings. Dejarnette said she did not finish because Edington called New Beginnings and reported that Dejarnette's case was closed. Dejarnette also stated that she had multiple counselors at Delta Counseling, and that interfered with her treatment there. She denied avoiding random drug screens. She said that she was not home when DHS visited, and she called them back and told them when she would be home. Finally, she testified that she refused the fingernail test because she is Pentecostal, and a family member told her it was against their religion.

At the conclusion of the hearing, the circuit court took the case under advisement. On January 7, 2022, the circuit court reconvened and orally granted DHS's petition to terminate Dejarnette's parental rights. The circuit court entered a written order of termination on January

8

13. In the order, the court found that all three statutory grounds alleged by DHS had been proved and that termination was in the best interest of the children. This appeal followed.

Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Dowdy v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 180, at 10, 314 S.W.3d 722, 727. Pursuant to Arkansas Code Annotated section 9-27-341(b)(3)(A)(i) and (ii) (Supp. 2021), an order terminating parental rights must be based on a finding that termination is in the child's best interest, which includes consideration of the likelihood that the juvenile will be adopted and the potential harm caused by returning custody of the child to the parents. In addition, the proof must establish at least one of several statutory grounds. Ark. Code Ann. § 9-27-341(b)(3)(B). The facts warranting termination of parental rights must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3).

When the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on appeal is whether the circuit court's finding is clearly erroneous. *Dowdy*, 2009 Ark. App. 180, at 11, 314 S.W.3d at 728. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.*, 314 S.W.3d at 728. We give a high degree of deference to the circuit court because it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Id.* at 11–12, 314 S.W.3d at 728.

The circuit court terminated Dejarnette's parental rights, finding three grounds: twelve-month failure to remedy by a custodial parent, subsequent other factors, and aggravated

9

circumstances. Although the circuit court found three statutory grounds for termination, we may affirm a termination on only one ground. *Cullum v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 34, at 7. We hold that the circuit court did not clearly err in finding aggravated circumstances supported its termination order.

A court of competent jurisdiction may terminate parental rights when the parent is found to have subjected any juvenile to aggravated circumstances. Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)* (Supp. 2021). Relevant to the instant case, aggravated circumstances means that "a determination has been or is made by a judge that there is little likelihood that services to the family will result in successful reunification." Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(B)(i)*. To prevail on this ground, DHS was required to demonstrate that if appropriate reunification services were provided, there is little likelihood that reunification could be achieved. *Cullum*, 2022 Ark. App. 34, at 7.

Dejarnette argues on appeal that the circuit court clearly erred in finding that the aggravated-circumstances ground supports its termination decision because the evidence demonstrates that she complied with the case plan, reached mental-health stability, and—with continued services—could successfully reunite with her children. Dejarnette relies on her testimony that she completed the case plan except attending four drug-counseling sessions at New Beginnings and continuing counseling at Delta Counseling. She explains that she tried to seek treatment with Delta Counseling but failed to consistently attend her appointments due to scheduling confusion within Delta Counseling. She points out that her therapist, Harper, confirmed this when she (Harper) testified that Dejarnette's mental-health progress at Delta Counseling was hindered by the number of therapists she had there. Harper further testified

that Dejarnette was compliant with her medication, was improving, and was capable of being rehabilitated. Dejarnette also relies on the testimony of CASA Palmer, who testified that she (Dejarnette) was appropriate when visiting her children and provided them with necessary care. Palmer additionally testified that she was opposed to the termination of Dejarnette's parental rights and instead opined that Dejarnette should receive additional time to have unsupervised visits with her children.

The circuit court found that after fifteen months of this case being open and services being offered or made available to Dejarnette, there is little expectation that continued services to her would result in successful reunification with her children. There is ample evidence in the record to support this finding. For example, two protective-services cases have been filed against Dejarnette: one for substance misuse from February 2017 to April 2018 and a second for inadequate supervision in February 2020 to July 2020. As part of these cases, Dejarnette received medical services, home visits, transportation, crisis intervention, housing, drug assessment, drug screening, substance-abuse treatment (inpatient and outpatient), daycare services, parenting education, counseling, and weekly worker and program-assistant visits. These services proved unsuccessful as Dejarnette suffered a psychotic episode on July 28, 2020 (while the second protective-services case was pending) that led to the filing of this dependency-neglect case.

Further, in the instant case, the circuit court's orders consistently found that, despite DHS's providing multiple services to Dejarnette, she failed to comply with the case plan and was not making meaningful progress in the case. The testimony of DHS caseworker Edington and DHS program assistant Simpson coupled with the documents admitted into evidence

11

further demonstrate that throughout the case, Dejarnette was almost never compliant with drug screens or home visits and that her compliance with medication management, drug treatment, mental-health treatment, and visitation was sporadic. We have held that a parent's failure to benefit from the services provided demonstrates little likelihood that further services will result in a successful reunification. *Cullum*, 2022 Ark. App. 34, at 9. Edington specifically testified at the termination hearing that there were no further services that DHS could offer Dejarnette to reunify her with her children. In *Reyes-Ramos v. Arkansas Department of Human Services*, 2019 Ark. App. 46, at 11–12, 571 S.W.3d 32, 39, this court affirmed the circuit court's termination order under the aggravated-circumstances ground, in part, on the caseworker's testimony that there were no further services that DHS could offer to reunify appellant with her children. Finally, there was evidence that during the case, Dejarnette continued to suffer from mental-health problems and was admitted to the hospital for mental-health treatment three times. This court has affirmed an aggravated-circumstances finding on the basis of considerable testimony and other evidence that the parents could not overcome their mental-health issues to appropriately parent their child. *Peterson v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 75, at 12, 15, 595 S.W.3d 38, 45–46.

Dejarnette's argument for reversal relies heavily on the testimony of Palmer and Harper that favored her (Dejarnette's) position. However, Palmer also offered testimony that supports the circuit court's aggravated-circumstances finding. For example, Palmer admitted that her CASA report recommended termination of parental rights because Dejarnette's progress was inconsistent—she missed visits with her children, did not attend counseling appointments, was discharged from in-home services with St. Francis for failing to meet her goal, and was

discharged from New Beginnings for noncompliance and not having a medication count or drug test completed. Palmer also testified that her opinion that Dejarnette's parental rights should not be terminated was based on Dejarnette's representation that she was attending her appointments and taking her medication, and Palmer agreed that if Dejarnette was not complying with her medical treatment and taking her medication, then she does not have the capacity to care for her children. And while Harper testified that Dejarnette is taking her medication, is keeping clean, is attending day treatment, and has the capability of being a good parent, Harper conceded that she was assigned to Dejarnette's case just one week before the termination hearing, and other than one emergency phone call in September 2021, Harper had had only one in-person session with Dejarnette.

In sum, Dejarnette's argument directs us to testimony that only favors her and essentially asks this court to reweigh the evidence in her favor, which we will not do because credibility determinations are for the circuit court to make, not this court. *Boomhower v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 397, at 8, 587 S.W.3d 231, 236. In light of the evidence that DHS had been providing services to Dejarnette for almost a year and a half by the time of the termination hearing, and because she failed to stabilize her mental-health issues, we hold that the circuit court did not clearly err in finding that there is little likelihood that additional services to the family would have resulted in successful reunification. Because only one statutory ground is necessary to be proved to support a termination order, we need not discuss Dejarnette's other statutory-grounds arguments. *Alexander v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 345, at 14, 634 S.W.3d 807, 817.

In addition to finding the existence of at least one statutory ground in order to terminate parental rights, a court must also find that termination of parental rights is in the child's best interest, taking into consideration two statutory factors: (1) the likelihood of adoption if parental rights are terminated and (2) the potential harm caused by continuing contact with the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i), (ii). Dejarnette does not challenge the adoptability factor; therefore, our focus is on the potential-harm prong of the circuit court's best-interest finding. In considering the potential harm caused by returning the child to the parent, the court is not required to find that actual harm would result or to affirmatively identify a potential harm. *Corley v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 397, at 8, 556 S.W.3d 538, 543. Potential harm must be viewed in a forward-looking manner and in broad terms. *Id.*, 556 S.W.3d at 543.

Dejarnette argues that DHS failed to prove potential harm because she had made progress with her mental-health condition, she was not actively suffering from any related issues and did not pose a risk of harm to her children, and it was unreasonable to deny her request for more time when there was no mention of a plan to have her children adopted together and no evidence presented about the children's relationship or the impact the termination decision would have on them. Dejarnette contends that the only way to reunify the children with each other is through reunification with her.

For support, Dejarnette again relies on the favorable testimony of Harper and Palmer along with her own testimony and argues that she sought help when she needed it, is participating in treatment, is taking her medication, completed practically everything that DHS had requested of her, and has a relationship with her children. This argument is another request

for this court to reweigh the evidence in favor of Dejarnette. For the reasons stated above, we reject this argument.

Dejarnette next argues that while she is not perfect and that she had some "missteps along the way," this court in *Rhine v. Arkansas Department of Human Services*, 2011 Ark. App. 649, at 10–11, 386 S.W.3d 577, 583, held that flawless compliance with court orders is not required and that the law does not require a parent to be perfect in order to retain his or her parental rights. In *Rhine*, the father had complied with the case plan and was given custody of his daughter for "phased-in expanded visits." *Id.* at 4, 386 S.W.3d at 579. During that time, two minor alcohol-related incidents occurred that were in violation of the father's court orders and his parole. The first incident involved the father drinking at home while the child spent the night at a friend's house, and the second incident involved the father and child in a car with another passenger who had an open container of alcohol. Neither incident led to criminal charges against the father or revocation of his parole, and at the termination hearing, the father acknowledged his poor decisions and his need for improvement. We held these isolated and minor incidents of noncompliance did not necessitate a termination of Rhine's parental rights in order to protect his child. *Id.* at 8, 386 S.W.3d at 581.

The circumstances here, however, are not similar to those in *Rhine* because unlike the parent in *Rhine*, Dejarnette never demonstrated compliance with the case plan sufficient to have custody or even unsupervised visits with her children. Further, Dejarnette's deficiencies cannot be characterized as "a few lapses in judgment"; rather, she consistently failed to comply with the case plan and court orders, and she never resolved her mental-health issues.

Finally, Dejarnette argues the circuit court's best-interest finding was clearly erroneous because it failed to consider how termination would affect her children's relationships with each other if separated after termination. However, Dejarnette failed to preserve this argument for appeal. *Defell v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 27, at 7 (holding that the appellant failed to raise the sibling-separation argument before the circuit court; therefore, it was not preserved for appeal). Further, we will not review a matter on which the circuit court has not ruled, and the burden of obtaining a ruling is on the movant. *Id.*

Even assuming Dejarnette had preserved the sibling-separation argument for appeal, it would fail. This court has held that keeping siblings together is an important consideration but is not outcome determinative because the best interest of each child is the polestar consideration. *Dollins v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 306, at 5. Furthermore, evidence of a genuine sibling bond is required to reverse a best-interest finding based on the severance-of-a-sibling-relationship argument. *Id.* at 5–6.

In the case at bar, there was no evidence presented at the termination hearing of a sibling bond between Minor Child 1, Minor Child 2, Minor Child 3, and Minor Child 4. The evidence merely shows that Minor Child 1, Minor Child 2, and Minor Child 3 are together in relative placement and that Minor Child 4 is in the custody of foster parents. There was some evidence that the children are together during supervised visitation with Dejarnette, but there was also testimony that visitation was irregular. Without some evidence of the existence of a sibling bond, we hold that the circuit court did not clearly err in finding termination was in the best interest of Minor Child 1, Minor Child 2, Minor Child 3, and Minor Child 4.

Affirmed.

MURPHY and BROWN, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.