Cite as 2023 Ark. App. 81

# ARKANSAS COURT OF APPEALS

DIVISION I
No. CV-22-417

| | | |
|---|---|---|
| | | Opinion Delivered February 15, 2023 |
| JAMIE LYALL | | |
| | APPELLANT | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT [NO. 66FJV-20-157] |
| V. | | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN | | HONORABLE ANNIE HENDRICKS, JUDGE |
| | APPELLEES | AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant Jamie Lyall[1] appeals after the Sebastian County Circuit Court filed an order terminating her parental rights to her four children, Minor Child 1 (MC1) (DOB 12-08-08); Minor Child 2 (MC2) (DOB 02-02-10); Minor Child 3 (MC3) (DOB 02-22-17); and Minor Child 4 (MC4) (DOB 03-08-19).[2] Appellant argues on appeal that the circuit court's best-interest determination was in contravention of our case law and Arkansas Code Annotated section 9-27-341(a)(3). We affirm.

---

[1]Appellant is also referred to as Jamie Olsen at times in our record. Although appellant testified that she is no longer married to Johnathan Lyall, she kept her ex-husband's last name. Olsen is her maiden name.

[2]The circuit court additionally terminated the parental rights of Johnathan Lyall, MC3 and MC4's father; however, he is not a party to this appeal.

## I. *Relevant Facts*

On April 23, 2020, the Arkansas Department of Human Services (DHS) filed a petition for emergency custody and dependency-neglect asking the circuit court to find MC3 and MC4 dependent-neglected and to place them in DHS's custody. The petition stated that MC3 and MC4 have three half siblings, MC1, MC2, and Minor Child 5 (MC5) (DOB 03-01-15). MC5 is deceased, and DHS explained that MC1 and MC2's father, Anthony Sam, had been granted custody of MC1 and MC2 pursuant to a Crawford County Circuit Court order. DHS further acknowledged that MC1 and MC2 had been living in Tennessee with Sam at that time. In the affidavit attached to the petition, DHS stated that a seventy-two-hour hold was exercised over MC3 and MC4 on April 20, 2020. DHS had received a call from the Fort Smith Police Department explaining that Police Officer Underwood had found appellant walking down Garrison Avenue with MC3 and MC4 in tow at approximately 1:00 a.m. Appellant was under the influence, did not know where she was, and was unable to answer many questions. The children were dirty and hungry—they had not eaten since the morning of the day before the incident. Appellant admitted that she had used an illegal substance that morning but did not remember what it was called. She was subsequently arrested and charged with two counts of endangering the welfare of a minor.

The circuit court granted the petition, finding that probable cause existed for MC3 and MC4's removal, and a probable-cause order was filed on April 29, 2020. Appellant was ordered to submit to a ninety-day hair-follicle test, make herself available for random drug screens, and keep DHS apprised of her contact information.

On May 15, 2020, DHS filed a petition for ex parte emergency order for protection of juvenile from immediate danger. DHS alleged that the petition concerned MC1 and MC2. Although DHS acknowledged that MC1 and MC2 were in Sam's custody, DHS alleged that all four children were dependent-neglected as defined under the Juvenile Code because they were at substantial risk of serious harm as the result of abuse, neglect, and/or parental unfitness. DHS further requested that the circuit court enter an order prohibiting appellant from having any contact with MC1 and MC2.

The circuit court granted the petition, and a probable-cause order was subsequently filed on June 3, 2020. In the probable-cause order, the circuit court explained that although Sam had been awarded full custody of MC1 and MC2, the Crawford County Circuit Court had awarded appellant some visitation. The circuit court found that because any visitation would be contrary to the children's welfare, it enjoined and restrained appellant "from having any contact with said juveniles unless such has been specifically approved in advance by [DHS]." Appellant was ordered to cooperate with DHS, submit to random drug screens, and keep DHS apprised of her contact information.

An adjudication order was filed on June 6, 2020, finding MC3 and MC4 dependent-neglected on the bases of parental unfitness and threat of harm. It noted that if the maternal grandparents wished to have placement of the children, then they needed to obtain a home study from a licensed social worker that contained proper background checks and present it

to the court.[3]  It further noted that in addition to the charges that were pending against appellant as a result of her arrest on the night the children were removed, appellant was arrested the day before the adjudication hearing for second-degree forgery.  Appellant was ordered to keep DHS apprised of all her court dates, pleas, sentences, and any future arrests; obtain and maintain stable and appropriate housing; obtain lawful employment and transportation; comply with her case plan; complete parenting classes; attend individual counseling; undergo a psychological evaluation and complete any treatment recommended; complete domestic violence and/or anger management classes; stay clean and sober; submit to a drug-and-alcohol assessment and complete all treatment recommended; and submit to random drug screens, hair-follicle tests, and alcohol swabs at the request of DHS.  The circuit court also stated that because the no-contact order that had been entered with regard to MC3 and MC4 as a result of appellant's pending charges of endangering the welfare of a minor child might have been modified to allow contact if approved by DHS, the circuit court gave DHS the discretion to allow visitation that is consistent with any orders in effect through appellant's criminal case.

---

[3]Although MC3 and MC4 had been placed with the maternal grandparents after their removal from appellant, the circuit court terminated that placement at the adjudication hearing due to troubling testimony that the grandparents believed that the government collects money for each person who dies in the hospital and the government surveils citizens through microchips that are introduced into their bodies through vaccinations.  The circuit court was especially troubled that the grandparents did not believe in traditional medical care and was concerned that the children had medical needs that the grandparents would not address, including MC3's hearing loss and an unknown source of blood from his ear.

A second adjudication order was filed on October 6, 2020, finding MC1 and MC2 dependent-neglected on the basis of parental unfitness. The circuit court ordered that MC1 and MC2 remain in the care and physical custody of their father and that DHS maintain a protective-services case as to MC1 and MC2. The circuit court, however, permitted visitation at the discretion of DHS subject to certain restrictions enumerated in the order. The circuit court set the goal of the case as to MC1 and MC2 as preservation with their father. Appellant was subject to the same orders as included in the June 6, 2020, order. No appeal was filed from either adjudication order.

After a review hearing that was held on October 7, 2020, the circuit court filed a review order on March 17, 2021. The circuit court continued the goal of the case regarding MC3 and MC4 as reunification, and it continued the goal of the case regarding MC1 and MC2 as family preservation/permanent custody with the father. DHS was ordered to maintain a protective-services case as to MC1 and MC2. Regarding appellant's compliance, the circuit court made the following findings:

> The mother has made progress during this review period. She recently acquired housing . . . and reportedly signed a lease on 09/22/2020. She stated that she has been employed at Dollar Gender, in Alma, AR since July 1, 2020. She underwent a psychological evaluation on 07/15/2020. She has been attending parenting classes and domestic violence classes. She submitted to a drug and alcohol assessment on 06/15/2020 and has participated in some treatment. However, she continues to use illegal drugs, as evidenced by her positive drug screen on 09/16/2020. She still has pending criminal charges. The mother is put on notice that her continued methamphetamine use is a deal-breaker for the court regarding reunification. She should conduct herself accordingly.

In addition to the prior orders, appellant was ordered to submit to a ninety-day extended-panel hair-follicle test before the next hearing.

A permanency-planning hearing was held on April 28, 2021, and an order was filed on July 12, 2021. The circuit court continued the goal of the case regarding MC3 and MC4 as reunification, but it added a concurrent goal of adoption after termination of parental rights. It continued the goal of the case regarding MC1 and MC2 as family preservation/permanent custody with the father. The circuit court noted that appellant stated that she had resolved her criminal charges for endangering the welfare of minors by pleading guilty and being sentenced to a five-year suspended imposition of sentence. Regarding her forgery charge, a hearing was scheduled the day before the permanency-planning hearing, but appellant failed to appear. Appellant was escorted by a public defender to address that criminal matter after the permanency-planning hearing had concluded. Regarding appellant's compliance, the circuit court noted that appellant attended a drug-and-alcohol assessment and attended co-occurring treatment. However, appellant tested positive for drugs after completing her treatment and was asked to undergo a second drug-and-alcohol assessment. Appellant was ordered to submit to a 180-day hair-follicle test as soon as possible and a 90-day extended-panel hair-follicle test just before the next hearing.

Subsequently, a fifteen-month review hearing was held on July 14, 2021, but an order was not filed until October 20, 2021. The circuit court continued the goals of the case. It further noted that appellant had resolved her pending charge for forgery during the review

6

period by pleading guilty and being sentenced to a six-year suspended imposition of sentence. Regarding compliance, the circuit court stated that DHS had contended that it had difficulty maintaining contact with appellant even though it had made multiple visits to the address that appellant reported she resided. The circuit court found that appellant had not made herself available for random drug screens; had not been attending counseling; had been arrested for DWI and failing to submit to a breathalyzer test; was unwilling to accept fault for the children's removal; and had failed to rehabilitate herself.

On September 13, 2021, Sam filed a petition for a home study and placement. In this motion, he prayed that he be granted placement of MC3 and MC4 rather than them remaining in foster care. He explained that he is the biological father of the children's half siblings, and he requested that a home study be performed to allow MC3 and MC4 to be placed with him and their half siblings.

Thereafter, the attorney ad litem filed a petition to terminate appellant's parental rights on November 15, 2021, specifically alleging that appellant's parental rights should be terminated based on the statutory grounds of failure to remedy, aggravated circumstances, and subsequent factors. *See* Ark. Code Ann. § 9-27-341(b)(3) (Supp. 2021). A termination hearing was held on January 12, 2022, and April 6, 2022.[4]

---

[4]Due to service issues regarding Johnathan Lyall, MC3 and MC4's father, the termination hearing was bifurcated. Therefore, the circuit court heard evidence regarding appellant's case on January 12, 2022, and Lyall's case was heard on April 6, 2022. However, only one termination order was subsequently filed on April 26, 2022, addressing both parents.

At appellant's termination hearing on January 12, 2022, appellant stipulated to the case history as already outlined above. She admitted that she had not seen MC3 and MC4 since June 2020 and had not seen MC1 and MC2 for at least three years. Regarding drug treatment, she admitted that she had previously completed outpatient treatment and that, since that time, she had relapsed a few times and had used methamphetamine. She further admitted that she had not completed any additional treatments since her relapse. She claimed that she did not qualify for the inpatient treatment she wanted because she was not "on drugs" at the time she would have been admitted. Appellant additionally admitted that she had not submitted to any drug screens since the previous hearing and that she had been living with her parents, in jail, or wherever she could during the pendency of the case. At the time of the termination hearing, appellant claimed that she was living with her mother again. Although appellant testified that she had a vehicle, she explained that it was "broken down" and needed repairs. She also admitted that the registration had been expired for almost a year. Appellant thought she needed another couple of months to find steady employment and a home before the children could be returned to her custody. She stated that she did not think she needed drug treatment and stated that she had "just stopped"; however, after further questioning, appellant admitted that further treatment "can't hurt."

Sam testified that he has had custody of MC1 and MC2 since MC5's death, and DHS was going to place the children in foster care at that time due to the circumstances surrounding MC5's death. Sam explained that appellant had asked him to take care of the children, and he received custody with appellant being awarded visitation. When asked

whether he thought appellant's parental rights should be terminated, he testified that he thought it was emotionally the best thing for the children. He explained that he is in the military; stationed in Clarksville, Tennessee; is married; has two other children; and has taken care of MC1 and MC2 since he received custody. Sam testified that appellant has never in the last three years sent MC1 or MC2 a birthday card, offered to provide any support, or called him to ask about the children. He did not want appellant to have any visitation with the children. Because MC2 is "a very emotional little girl," he was "scared what [visitation] could do to her." He explained that MC2 was attending counseling twice a month.

Tiffany Tillman, MC3 and MC4's foster parent, testified that the children had been placed with her since November 2, 2020. She said that the children had no diagnosed medical conditions when they first came to her. However, MC3 almost seemed autistic at that time, saying only a handful of simple, single words, and MC4 experienced a lot of separation-type issues. Since that time, both children have made amazing progress. MC3 tests normal in speech and was expected to start kindergarten without any delays. There are no longer any concerns that he is autistic. MC4 had also made "great strides." Tillman expressed her interest in adopting MC3 and MC4 if appellant's parental rights were terminated.

London Barlow, the caseworker assigned to the case, testified regarding the case history as outlined above. Barlow testified that, although appellant recently reached out to ask for visitation with her children, no visitation was set up at that point because the

9

termination hearing was so close. Barlow opined that appellant had not remedied the cause of the children's removal, and she stated that there were additional issues that arose subsequent to the children's removal. She explained that appellant had relapsed and did not complete any drug treatment since her relapse. She was unaware whether all of appellant's criminal charges had been resolved at that time. Barlow recommended that appellant's parental rights be terminated as to all four children. She thought all four children would be at risk of harm. She cited the progress MC3 and MC4 had made without any assistance from or visitation with appellant. She further explained that MC1 and MC2 would be at risk of harm even with the plan for them to remain in Sam's care. She explained that appellant had been inconsistent, she had failed to have anything to do with them, and it would cause emotional trauma to reintroduce appellant to them at that point. Barlow expressed that she was concerned appellant would not remain sober given her failure to go back to treatment and given appellant's own testimony that she "can't promise that she's going to remain sober." She also expressed concerns about appellant's lack of housing and employment. Barlow testified that she had no concerns that the children are adoptable. She did not recommend that appellant be granted a final visit with any of the children.

DHS and the attorney ad litem moved to amend the pleadings to conform to the testimony presented at the hearing pursuant to Arkansas Rule of Civil Procedure 15(b), and the circuit court granted DHS's motion. At the conclusion of the termination hearing, the circuit court orally ruled from the bench that it was granting DHS's petition for termination of parental rights.

The circuit court filed a written order terminating appellant's parental rights on April 26, 2022. The circuit court specifically found by clear and convincing evidence that all three statutory grounds alleged in the petition supported termination and that it is in the best interest of the children to terminate appellant's parental rights. Relevant to appellant's points on appeal, the circuit court made the following specific findings:

12. After considering the evidence, the Court finds that the evidence proves the following grounds:

**A. The juveniles have been adjudicated by the Court to be dependent-neglected and have continued to be out of the custody of the mother for twelve (12) months and, despite a meaningful effort by the Department to rehabilitate the mother and correct the conditions that caused removal, those conditions have not been remedied.**

. . . .

vii. To date, the mother has not made any further efforts at compliance. She has not seen the juveniles in almost two years. The mother has not achieved stability in the past twenty (20) months. She moved to central Arkansas for a period of time but is now staying with her parents, who the Court has already determined are not appropriate caregivers for [MC3] and [MC4]. The mother reports that she has been clean and sober for a few months, but has not participated in any treatment since her relapse. The mother was very timid about her sobriety and could not reassure the Court that she could remain clean and sober. The issue that caused removal was the mother's impairment due to her drug addiction and she has not remedied the cause of removal. The Department has made reasonable efforts throughout this case to assist the mother in reunifying with her children but those efforts have been unsuccessful.

**B. That other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juveniles in the custody of the mother is contrary to the juveniles' health, safety, and welfare and that, despite the offer of appropriate family services, the mother has manifested the incapacity or indifference to remedy the subsequent issues or factors or to rehabilitate the mother's circumstances that prevent the placement of the juveniles in the custody of the mother.**

11

i. Subsequent to the original petitions for dependency-neglect, the mother has incurred additional criminal charges, has been slow to address the charges she incurred at the outset of this case and was subject to a no-contact order for more than a year, failed to address her criminal charges and had a warrant for her arrest at one point, relapsed after completing treatment and failed to reenter treatment or demonstrate that she can achieve lasting sobriety, and has failed to complete her case plan. The Department has offered the mother services to address these issues but her failure to cooperate with the Department and her lack of urgency in remedying these factors demonstrates her incapacity or indifference to remedying her circumstances. She reported that she would enter residential treatment on January 4, 2022 but failed to do so. The mother's tenuous sobriety and her criminal behavior, in particular, are barriers to the juveniles safely reunifying with the mother.

**C. The Court finds that the juveniles have been subjected to aggravated circumstances; specifically, that there is little likelihood that services to the family will result in successful reunification.**

i. The mother has had services available to her for more than twenty (20) months, but she has demonstrated a lack of diligence in her efforts to reunify with her children. The mother acknowledged that she is not ready for the children to return to her care and that she would require more time, yet was uncertain about how long she would need. Further, the mother lost custody of [MC1] and [MC2] at the time her other child passed away. The juveniles went to go live with their father, Anthony Sam, and the mother has not maintained regular contact or visitation with them. The mother's lack of progress in the past twenty months demonstrates that the offer of more time or services would be futile.

. . . .

13. Pursuant to Ark. Code Ann. § 9-27-341(c)(2), a Court may terminate the rights of one parent and not the other parent if the Court finds that it is in the best interests of the juveniles to do so. The Court finds that it is in the best interest of [MC1] and [MC2] for their mother's rights to be terminated, but that they remain in the custody of their father, Anthony Sam. Return to the custody of the mother is contrary to the welfare, health, and safety of the juveniles, [MC1] and [MC2], and continuation in the custody of their father, Anthony Sam, is in the best interests of the juveniles and necessary to their protection. The current case plan goal, permanent custody of [MC1] and [MC2], is in the best interests of the juveniles. The juveniles are no longer in need of the services of the Department of Human Services. The Court finds that Jamie Olsen's parental rights to [MC1] and [MC2] are hereby

terminated. The Court awards permanent custody of [MC1] and [MC2] to their father, Anthony Sam. [MC1], [MC2], and Anthony Sam shall be dismissed as parties to this case.

14. The Court also finds that the evidence proves the termination of parental rights of Jamie Olsen and Johnathan Lyall is in the best interest of the juveniles, [MC3] and [MC4]. In making this finding, the circuit court considered all relevant factors, including the likelihood that the juveniles would be adopted if the parental rights were terminated, and the potential harm, specifically addressing the effect on the health and safety of the juveniles, that could be caused by returning the juveniles to the parents.

A. As to the juvenile's adoptability, the Court finds that the juveniles, [MC3] and [MC4], are adoptable. The juveniles have been stable in their foster home placement and [MC3], in particular, has made tremendous progress in his therapies. The juveniles' foster parents have expressed an interest in adopting the juveniles and this is an appropriate and viable plan. Even if this adoption does not come to fruition, the juveniles have no medical, behavioral, emotional, or other issues that would be a barrier to adoption. As to [MC1] and [MC2], the Court finds that the issue of adoption is not legally relevant, as they are placed in the permanent custody of their father.

B. As to potential harm, the Court finds that the juveniles would be subjected to potential harm. The above facts supporting the grounds for termination of parental rights also demonstrate the risk of harm to the juveniles if returned to Jamie Olsen or Johnathan Lyall. The juveniles would be at risk of physical and psychological harm. Neither parent has seen the juveniles for a substantial period of time. The mother has not successfully addressed her substance abuse issues or her criminal charges. Her living situation is not appropriate. Johnathan Lyall has been absent from his children's lives, and he has numerous outstanding criminal issues and is likely homeless.

15. The Court, therefore, grants the attorney ad litem and Department's petition and terminates all parental rights between Jamie Olsen and the juveniles, [MC1] and [MC2], and between Jamie Olsen and Johnathan Lyall and the juveniles, [MC3] and [MC4], pursuant to section 9-27-341 of the Arkansas code. The Department is relieved of providing reunification services to the parents.

16. The Department's motion to conform the pleadings to the proof or evidence presented is hereby granted.

This appeal followed.

## II. *Standard of Review*

A circuit court's order terminating parental rights must be based upon findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, an appellate court gives due deference to the opportunity of the circuit court to judge the credibility of witnesses. *Id.*

In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in

14

section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. *Reid v. Ark. Dep't of Hum. Servs.*, 2011 Ark. 187, 380 S.W.3d 918.

The intent behind the termination-of-parental rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Cobb v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 85, 512 S.W.3d 694. Moreover, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Id.* Finally, a parent's past behavior is often a good indicator of future behavior. *Id.*

## III. *Best Interest*

Appellant does not challenge the circuit court's findings as to the statutory grounds for termination; she argues only that the circuit court's best-interest determination was in contravention of our case law and Arkansas Code Annotated section 9-27-341(a)(3), which provides that the purpose of our termination statute is to provide permanency in a juvenile's life when returning the juvenile to the family home is contrary to the juvenile's health, safety, or welfare. In determining whether termination is in the best interest of a child, the circuit court must consider the entire history of the case and all relevant factors in the case, including the likelihood that the child will be adopted and the potential harm that would

15

be caused by returning the child to the custody of the parent. *Foster v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 418, 559 S.W.3d 762. Adoptability and potential harm, however, are merely two factors to be considered and need not be established by clear and convincing evidence. In *Phillips v. Arkansas Department of Human Services*, 2019 Ark. App. 383, at 12, 585 S.W.3d 703, 709–10, we stated that some of the

> [c]onsiderations in making a best-interest finding may include: the preservation of the children's relationship with a grandparent; the severance of child support from a parent; whether a less drastic measure could be employed such as a no-contact order or supervised visitation; whether continued contact with the parent would be beneficial to the children if or when the children are living with a relative and not in an indeterminate state that is working against them; and whether the children are living in continued uncertainty.

## A. MC1 and MC2

Appellant first argues that the circuit court's adoptability and best-interest analysis was clearly erroneous as to MC1 and MC2. She more specifically argues that MC1 and MC2's permanency was never at risk because they had already been placed in their father's care and that the no-contact order in place prohibited her from obtaining custody without further court intervention. She further argues that she is not "toxic" to her children and that she had never harmed her children. She explains that the only reason she had been absent from their lives was due to the court's order prohibiting her from having contact. Therefore, she argues that termination is not in MC1 and MC2's best interest because it "forever forecloses the possibility that [MC1 and MC2] could have at some point, especially as they get older, a solid relationship with their mother while in the custody of their father."

16

Appellant analogizes this case to the facts in *Caldwell v. Arkansas Department of Human Services*, 2010 Ark. App. 102, and *Lively v. Arkansas Department of Human Services*, 2015 Ark. App. 131, 456 S.W.3d 383, both of which involve a similar factual situation wherein a father's parental rights were terminated while the child or children remained in the care of the mother. In *Caldwell, supra*, this court concluded that because the child remained in the permanent care of her biological mother, termination of the father's parental rights would not achieve permanency, which is the goal of the statute. Moreover, other factors, including preservation of the child's relationship with her paternal grandparents and the lack of any evidence that the father had physically abused or harmed the child, weighed against termination. In *Lively, supra*, we found error in the circuit court's best-interest determination because there was no evidence of adoptability. In addition, we noted that terminating the father's parental rights jeopardized the children's relationship with their paternal grandparents as well as the financial support that the father might provide to the children. *Id.*

The circumstances here, however, are not like those in *Caldwell* or *Lively*. In both of those cases, this court held that termination of a father's parental rights was not in the children's best interest, in large part due to close relationships between the children and their paternal grandparents. In both *Caldwell* and *Lively*, the circuit court had determined that the paternal grandparents were the most stable influences in the children's lives. We held that termination of the father's rights in those cases endangered these significant,

17

stabilizing relationships. *Caldwell*, 2010 Ark. App. 102, at 7; *Lively*, 2015 Ark. App. 131, at 8, 456 S.W.3d at 388.

Here, there is no evidence that MC1 and MC2 had a significant relationship with their maternal grandparents or any family on the mother's side, and appellant does not argue such on appeal. Instead, the maternal grandparents had placement of MC3 and MC4 at the beginning of the case, but it was quickly determined that they could no longer be a placement option due to their unconventional beliefs about government funding and surveillance as well as their views on medical care for the children. Therefore, the grandparent relationships that were a factor in *Caldwell* and *Lively* are not a concern here.

Additionally, although a court certainly may consider evidence of toxicity in analyzing best interest, appellant cites no authority, and we know of none, that requires a court to find that a parent is "toxic" before it may terminate parental rights as appellant alleges. *See White v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 459, 558 S.W.3d 423. A court may terminate the rights of one parent and not the other parent if the court finds that it is in the best interest of the child. Ark. Code Ann. § 9-27-341(c)(2)(B). A juvenile's need for permanency and stability overrides a parent's request for additional time to improve circumstances, and courts will not enforce parental rights to the detriment of the well-being of the child. *Dean v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 286, 600 S.W.3d 136. The intent of the termination statute is to provide permanency in the juvenile's life in all circumstances where a return to the parent is contrary to the juvenile's health, safety, or welfare and cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective. *Id.*

18

Here, we believe the facts are more like those in *White*, *supra*, and *Bobbitt v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 355. In both one-parent termination cases, we held that the record supported the circuit court's best-interest findings despite similar arguments because the mothers' instability would subject the children to potential harm if ever returned to them. Appellant does not dispute the evidence supporting the findings of potential harm. Moreover, it was clear that appellant had not successfully addressed her substance-abuse issues or all of her criminal charges, and her living situation was not appropriate. The fact that MC1 and MC2 are not up for adoption, standing alone, does not preclude this court from affirming the termination due to the potential harm the parent poses. *Foster*, *supra*. Adoptability is only one factor to be considered. *White*, *supra*. Thus, on this record we cannot say that the circuit court clearly erred.

## B. MC3 and MC4

Appellant next argues that the circuit court's best-interest findings were clearly erroneous as to MC3 and MC4. She explains that DHS supported its allegation that termination was in MC3 and MC4's best interest because it would be emotionally harmful to reintroduce appellant into their lives after two years of separation. Appellant argues that the circuit court could not base its findings on the "ground of abandonment" because it was DHS who prohibited her from continuing a relationship with the children when it obtained a no-contact order at the beginning of the case. However, this argument is misplaced.

The circuit court never found that appellant had abandoned her children as a ground for termination. Instead, the circuit court found three other independent grounds for

19

termination, and she has not challenged any of them on appeal. Although appellant attempts to place blame with DHS for her inability to have a relationship with her children, it was appellant's behavior and actions that caused the necessity of the no-contact order. Furthermore, in making its best-interest finding, the circuit court not only noted that appellant had not seen her children for a substantial period of time but further found that she had not successfully addressed her substance abuse or all of her criminal charges. Moreover, the circuit court found that her living situation was not appropriate.

Finally, appellant argues that the circuit court's decision failed to address MC3 and MC4's separation from their half siblings, MC1 and MC2. She explains that Sam had filed a petition seeking a home study and placement of MC3 and MC4 even though he is not their biological father to ensure the sibling relationship remained intact. Therefore, appellant argues that the circuit court should have granted his petition and placed the children in his care as a less restrictive alternative and kept her parental rights intact. We disagree.

DHS argues that this issue is not preserved because it was not argued at the termination hearing and cites *Defell v. Arkansas Department of Human Services*, 2022 Ark. App. 27. In *Defell*, we held that because the appellant failed to raise the sibling-separation argument before the circuit court, it was therefore not preserved for appeal. The same is true here.

However, even assuming appellant had preserved her arguments, they would fail. Although appellant is correct that Sam had filed a petition for a home study and placement,

the termination order specifically found that Sam had subsequently withdrawn it. As such, the circuit court found that the petition was "dismissed and held for naught." Moreover, this court has held that keeping siblings together is an important consideration but is not outcome determinative because the best interest of each child is the polestar consideration. *Dejarnette v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 410, 654 S.W.3d 83. Furthermore, evidence of a genuine sibling bond is required to reverse a best-interest finding based on the severance-of-a-sibling-relationship argument. *Id.* Here, there is no evidence of any sibling bond between the half siblings. Sam had received custody of MC1 and MC2 in 2016 after appellant's third child died, and they have resided with him in California and Tennessee since that time. MC3 and MC4 were born in 2017 and 2019, respectively. There is no indication in the record that the four siblings had ever lived together or formed any type of genuine sibling bond.

Thus, under these facts, we cannot say that the circuit court clearly erred when it determined that terminating appellant's parental rights was in the children's best interest. Accordingly, we affirm the order terminating appellant's parental rights.

Affirmed.

VIRDEN and MURPHY, JJ., agree.

*Leah Lanford*, Arkansas Commission for Parent Counsel, for appellant.

*Casey D. Copeland*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.

21